DAVID T. PROSSER, J.
¶ 76. {concurring in part, dissenting in part). From time to time every government agency would benefit from an impartial, objective review of the agency's practices and procedures. There is increasing evidence of the need for such an evaluation of the Office of Lawyer Regulation (OLR). This case highlights some of the problems facing the agency and why an objective review would be desirable.
I
¶ 77. It must be stated at the outset that the misconduct of Attorney Kenneth Kratz requires discipline. I concur in the recommendation of the referee that Attorney Kratz receive a four-month suspension, which is the suspension approved by the court.
*722 ¶ 78. OLR wanted a six-month suspension. A six-month suspension would require Attorney Kratz to seek readmission from this court, a process that often takes the better part of a year. A suspension of that duration would have been unreasonable.
¶ 79. OLR also asked that Attorney Kratz pay all costs of the proceeding, namely, $23,904.10, and the court approves these costs, contrary to the recommendation of the referee. The exorbitant costs requested by OLR — and granted by this court — require discussion and prompt this partial dissent.
II
¶ 80. OLR charged Attorney Kratz with 11 counts of misconduct. The first four counts involved S.VG. One of these counts was later dismissed by OLR. The counts involving S.VG. are the reason why Attorney Kratz requires discipline. They are described in ¶¶ 7-22 of the Per Curiam opinion.
¶ 81. Attorney Kratz's conduct was highly inappropriate and cannot be defended. What is important for this concurrence/dissent, however, is that the substance of these counts, including all text messages between Attorney Kratz and S.VG., were self-reported by Kratz to OLR on December 4, 2009, making proof of ethical violations easy to accomplish. Thus, one of the first issues to examine is why OLR did not file any charges against Attorney Kratz until November 30, 2011.
¶ 82. It seems obvious, in retrospect, that Attorney Kratz suffered a serious breakdown of some sort by October 2009.[1] He had been through considerable *723 stress from 2005 through 2009 as special prosecutor in the high profile murder trials of Steven Avery and Brendan Dassey in Manitowoc County. Post-conviction proceedings in Dassey's case were still pending in the fall of 2009, culminating in a five-day hearing in 2010. Attorney Kratz and his then-wife separated in October 2009, during this stressful period, and he began to abuse prescription drugs. Whether these stresses arid difficulties contributed to Attorney Kratz's October conduct is speculative, but the stresses and difficulties are not speculative.
¶ 83. Counts 1, 3, 4, 5, and 6 are based on incidents that occurred during October 2009. No date is given for the incident in Count 7.
¶ 84. Attorney Kratz's unacceptable text messages with respect to S.VG. took place over a period of three days in October 2009, approximately a week after separation from his wife. On the third day S.VG. took the matter to local police. Within two weeks, Kratz had removed himself from the criminal case in which S.VG. was the victim. After the Wisconsin Department of *724 Justice (DOJ) was notified of Attorney Kratz's conduct, it pressured Attorney Kratz to resign as chair of the Wisconsin Crime Victims' Rights Board and to self-report his misconduct to OLR. He did the latter on December 4, 2009, admitting his misconduct and expressing his embarrassment for it.
¶ 85. When OLR received Attorney Kratz's communication, including all the text messages, it commenced an investigation. Thereafter, on February 4, 2010, OLR received a grievance from S.VG. On February 18 an OLR investigator wrote to S.VG. asking that she contact the investigator. On March 5, having received no response from S.VG., the investigator notified S.VG. that the matter had been closed. Attorney Kratz was notified of this action. In sum, three months after it received all the information necessary to prosecute Attorney Kratz and barely a month after receiving the grievance from S.VG., OLR closed the case.
¶ 86. The record does not indicate why S.VG. did not follow up on her grievance. The record does not indicate why OLR closed the matter when it had ample evidence to proceed if it wished to do so. OLR's letter to S.VG. stated that Attorney Kratz's conduct "did not appear to involve possible professional misconduct."
¶ 87. Six months later, Keith Sellen, director of the OLR, was contacted by Ryan Foley, a reporter for the Associated Press (AP). Sellen later indicated in an affidavit that he had not been aware of the Kratz matter before the Foley inquiry.
¶ 88. The following day, September 15, 2010, Foley wrote a news story based on information he obtained from a police report released by the Kaukauna Police Department. Foley did not reveal how he learned about the police report describing Attorney Kratz's conduct.
*725 ¶ 89. Foley's AP story triggered a political firestorm less than two months before the 2010 general election. There were immediate calls for Attorney Kratz's resignation as Calumet County District Attorney. When Attorney Kratz did not resign, Governor James Doyle initiated proceedings to remove him from office.
¶ 90. The Kratz matter became a political issue.[2] Scott Hassett, the Democratic candidate for attorney general, accused his opponent, incumbent Attorney General J.B. Van Hollen, of knowing about the Kratz matter for nearly a year and doing "nothing about it."[3] Democratic Party Chair Mike Tate accused Van Hollen of a "cover up" "after discovering the sexually-harassing text messages fellow Republican and political ally Ken Kratz sent to a woman whose boyfriend he was trying for nearly strangling her to death."[4]
¶ 91. Attorney General Van Hollen responded to these attacks with assertions that the DOJ pressured Kratz to resign from the Crime Victims Rights Board and advised him to self-report his conduct to OLR. "There are no bones about the fact that the Office of Lawyer Regulation dropped the ball here," Van Hollen told the Post-Crescent newspaper in Appleton.[5] He said *726 he was surprised to learn that OLR had told S.YG. that Attorney Kratz's conduct "did not appear to involve possible professional misconduct." "I personally am very concerned with the fact that the Office of Lawyer Regulation determined that there was nothing wrong with this activity," he added.[6]
¶ 92. OLR, having now received a letter from S.VG.'s attorney, Michael Fox, reopened the Kratz investigation. Additional complaints came in. More than 13 months later, OLR filed its complaint.
Ill
¶ 93. From all appearances, OLR was determined to make up for "dropping the ball." It selected as outside counsel Thomas Basting, who filed 11 charges against Attorney Kratz, including seven counts related to four new matters. In one of these charges, OLR essentially accused Attorney Kratz of sexual assault:
After various phone conversations, Kratz asked to visit JW at her apartment. JW asserts that Kratz arrived at her apartment and after threatening JW, forced her to have sex. ...
On September 28, 2010, JW provided the information about Kratz to her probation officer at the Department of Corrections (DOC). The DOC reported the issue to the DOJ.
The DOJ interviewed JW who provided a statement. The statement JW provided alleges that Kratz, *727 while District Attorney of Calumet County, had forcible sex with an emotionally vulnerable woman after previously prosecuting the woman.
(Emphasis added.)
¶ 94. In filing this sensational charge pertaining to alleged sexual assault, OLR not only discredited Attorney Kratz but also implicitly criticized the DOJ and local law enforcement authorities for failing to prosecute him. It later quietly dismissed the charge.
¶ 95. As noted above, OLR also asked that Attorney Kratz be suspended from the practice of law for six months.
IV
¶ 96. Looking backward, OLR forced Attorney Kratz to defend his law license to avoid being required to apply for readmission to the bar, and to defend himself against alleged criminal conduct. Attorney Kratz admitted the S.VG. counts but disputed that he should be suspended for six months because of them. In time OLR dropped FIVE counts, including the alleged sexual assault count. The only new charges on which OLR prevailed were three counts involving tasteless sexual comments that Attorney Kratz made to two co-workers. The co-worker in Counts 5 and 6 acknowledged that Attorney Kratz's comments were out of character and that Attorney Kratz apologized and told her his comments were inappropriate and he should not have made them. The co-worker in Count 7 also said Attorney Kratz's comment was out of character.
V
¶ 97. In the years following S.VG.'s complaint to the Kaukauna police, Attorney Kratz was forced to resign as Calumet County District Attorney. He went *728 through a divorce. He lost his home and his car. He was sued by S.VG. in the United States District Court and settled the lawsuit.[7] He filed for bankruptcy. It is unlikely that Attorney Kratz is in any position to pay $23,904.10 in court costs. These extravagant costs will pose a serious hardship to Attorney Kratz, cannot be justified on the basis of the OLR prosecution, and are manifestly unfair.
VI
¶ 98. The Kratz case underscores the need for a thorough review of OLR practices and procedures.
¶ 99. First, OLR closed the investigation against Attorney Kratz without the knowledge of the OLR director, Keith Sellen. How did that happen?[8]
¶ 100. Second, after reopening the investigation, OLR took 13 months to file a complaint against Attorney Kratz. What is the justification for this lengthy delay?
¶ 101. Third, after a long investigation, OLR filed three sensational counts against Attorney Kratz that it later dismissed for lack of proof. Why did OLR's Pre *729 liminary Review Committee permit these counts to be filed? Is the Preliminary Review Committee serving its intended purpose of screening out improvident charges when it approves 98 percent of the OLR staffs recommendations?[9]
¶ 102. Fourth, OLR expects Attorney Kratz to pay all costs related to the prosecution of its improvident charges and its harsh desired level of discipline. Should a respondent attorney be expected to pay OLR's costs for charges that are not proven and a level of discipline sought but not imposed?
¶ 103. Fifth, OLR appears to be unwilling or unable to drop charges it has filed unless it acknowledges that the charges cannot be proved. It could likely have settled the Kratz matter much sooner if it had been able to bargain for something less than unconditional surrender. Should OLR have the authority to plea bargain with respondents? If so, under what conditions?
¶ 104. No doubt other questions could be raised about OLR's handling of the Kratz case. But apart from this single case, there are many reasons for this court to launch a thorough — strictly objective — review of the agency. If that review is undertaken, something useful may yet come out of this unfortunate tragedy.

 The referee in this case, former Oneida County Circuit Judge Robert E. Kinney, wrote the following in his "Report and Recommendation" to the court:
*723 Perhaps the most perplexing aspect of this case is the seeming incongruity between some of the respondent's professional accomplishments and the inexplicable behavior which he engaged in which brings him before the Court now... .
The respondent was appointed special prosecutor in the case of State v. Steven Avery. This was a high-profile case with state-wide media coverage. .. . During this time period, the respondent testified he had trouble sleeping and was prescribed the drug Ambien. ... Shortly thereafter, people observed a change in his behavior. .. . [T]he respondent testified that he had been prescribed Xanax for anxiety attacks, and was taking left-over Vicodin which had been prescribed earlier after he underwent surgery. The respondent testified that he developed a dependency on Ambien and Xanax. He testified that he believes the use of these drugs diminished his inhibitions and caused his speech to be more unfiltered.

 Jim Collar, Fallout With Calumet County District Attorney Ken Kratz Takes On Political Tinge, Appleton Post-Crescent, September 21, 2010.

 Cf. Challenger Scott Hassett Says Attorney General J.B. Van Hollen Knew About District Attorney Sexting Case But Did Nothing About It, Milwaukee Journal Sentinel, October 4, 2010 (citing Scott Hassett email to supporters); see also Van Hollen, a pretty good AG?, Isthmus, October 8, 2010 at 6.

 Press Release, Democratic Party of Wisconsin, J.B. Van Hollen's Ken Kratz Coverup Continues, (Sept. 21, 2010) (on file with author).

 Jim Collar, Wisconsin Attorney General J.B. Van Hollen Criticizes Office of Lawyer Regulation For Its Handling of Case *726 Involving Calumet County District Attorney Ken Kratz, Appleton Post-Crescent, Sept. 22, 2010).

 See interview by Dan Flannery, Executive Editor of Appleton Post-Crescent, with Wisconsin Attorney General J.B. Van Hollen at http://www.postcrescent.com/article/20100922/ APC0101/9220673/Wisconsin-Attorney-General-J-B-Van-Hollencriticizes-Office-Lawyer-Regulation-its-handling-case-involving-Calumet-County-District-Attorney-Ken-Kratz.

 Cf. S.V v. Kratz, No. 10-C-919, 2011 WL 6151480 (E.D. Wis. Dec. 12, 2011). See Sexting lawsuit against former prosecutor settled, Appleton Post-Crescent, February 13, 2013, at A3-4.

 Referee Kinney wrote:
[T]he respondent's letter which self-reported the incident involving SVG was received by the OLR on December 8, 2009. The matter was closed on March 5,2010 when the investigator received no response to her February 18, 2010 letter to SVG. The respondent was advised that the matter was closed at that point. It was then reopened by the OLR on September 24, 2010, more than 9 months after the respondent self-reported the SVG incident. The case simply sat in limbo for 9 months. While reports of other violations were then received, the closing of the file in March was obviously a mistake.

 A 98 percent approval rate is the percentage OLR Director Keith Sellen recently cited in his October 25, 2013, testimony on Rule Petition 13-04 before the supreme court.